J-S03021-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
TYRELL O. BISHOP :
:
Appellant : No. 3460 EDA 2017

Appeal from the PCRA Order October 18, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004691-2007

BEFORE: BENDER, P.J.E., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.: **FILED MARCH 06, 2019**

Appellant, Tyrell O. Bishop, appeals from the order entered on October

18, 2017, denying his petition under the Post Conviction Relief Act (PCRA), 42

Pa.C.S.A. §§ 9541-9546. We affirm.

We have previously summarized the facts underlying Appellant's

convictions.

> On April 30, 2004, at approximately 8:00 p.m., Philadelphia
> police detectives responded to a shooting on the 2100 block
> of South 64th Street in Philadelphia and discovered the body
> of Robert Coates (hereinafter "Decedent") lying face down on
> the sidewalk with several gunshot wounds. Detective John
> Hoyt approached an extremely upset man who he identified
> as Reginald Christopher Coates, Decedent's brother
> (hereinafter "Coates"). Coates informed the officers that he
> had witnessed the entire incident and frantically screamed for
> officers to find the shooter, "Rell," who was identified as
> Appellant. . . .
>
> Officers removed Coates from the scene in order to calm him
> down and to obtain more information about the shooting.

Coates explained that he knew Appellant from the neighborhood[,] as Appellant lived across the street from Decedent's home, where Coates had been staying for several months. Coates shared that he saw Appellant on a regular basis and gave the officers a description of Appellant as being 5'10" in height, having a light complexion and slightly large ears, and wearing a white t-shirt and jeans.

Prior to the shooting, Coates was walking home as his car broke down just around the corner from Decedent's house. On his way there, Coates was approached by Appellant's uncle, Robert Keyser, who tried to sell Coates a CD player for money to buy beer. After Coates refused to buy it, Keyser continued to ask Coates for money and the two men began to argue. The heated dispute escalated when Keyser pulled out a knife and Coates threatened to get a firearm.

As the men became more agitated, Decedent noticed the fight and came out of his house. Concerned for his brother, Decedent told Coates to get into his house, and Decedent approached Keyser to address the situation. As Coates was leaving the scene of the argument, he turned back and saw Appellant suddenly jump off the steps of his house across the street and raise his arm to Decedent. Coates noticed Decedent's children were in front of Decedent's house and rushed to protect them and get them inside. When Coates heard gunshots, he turned around and saw Decedent [lying] facedown on the ground. Coates watched as Appellant stood over Decedent and shot him several times in the back. Appellant immediately fled the scene on foot.

After officers took Coates to the homicide unit and showed him a photo array that included a picture of Appellant, Coates identified Appellant as the individual who shot his brother. Kyle Napper, another witness to the shooting, also gave a statement to police that Appellant was responsible for the shooting. Although Napper did not identify Appellant in a photo array, Napper testified that he knew Appellant from the neighborhood and knew where he lived.

Appellant was not apprehended until January 25, 2007 when Darby Borough police officers arrested him during the execution of a search warrant at a home in Darby, Pennsylvania. When officers entered the residence, three

black males jumped out the first floor windows of the home. When police pursued one of the males, he was violent and punched one of the officers in the face and body. This male was taken into custody where he gave police a false name of Michael Rucker. After the officers discovered it was in fact Appellant, they contacted Philadelphia police detectives who transported him back to Philadelphia to be tried for Decedent's murder.

*Commonwealth v. Bishop*, 38 A.3d 914 (Pa. Super. 2011) (unpublished memorandum) at 1-4, *appeal denied*, 46 A.3d 715 (Pa. 2012).

Appellant's first trial ended in a mistrial, after the jury was unable to reach a unanimous verdict. *See* Trial Court Order, 1/26/09, at 1. Appellant's second trial commenced on April 26, 2010. On April 30, 2010, the jury found Appellant guilty of third-degree murder and possessing instruments of crime.[1] On July 16, 2010, the trial court sentenced Appellant to serve an aggregate term of 22 ½ to 45 years in prison for his convictions. We affirmed Appellant's judgment of sentence on November 9, 2011 and the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on May 16, 2012. *Commonwealth v. Bishop*, 38 A.3d 914 (Pa. Super. 2011) (unpublished memorandum) at 1-10, *appeal denied*, 46 A.3d 715 (Pa. 2012).

On August 23, 2012, Appellant filed a timely, *pro se* PCRA petition and the PCRA court later appointed counsel to represent Appellant during the proceedings. Within Appellant's amended petition, Appellant claimed that his trial counsel was ineffective for failing to present the testimony of witness Charletta Haynes and a statement from Philadelphia Police Officer William Hill.

---

[1] 18 Pa.C.S.A. §§ 2502(c) and 907(a), respectively.

Appellant noted that Ms. Haynes testified on his behalf during his first trial – which ended in a mistrial. As Appellant claimed, during the initial trial:

> [Ms. Haynes] testified to seeing two males (not one) approach and shoot [D]ecedent. She also testified that she was twice unable to identify [Appellant] as one of the potential shooters (once in the photo array, and then again in a lineup). As an uninterested eyewitness, her testimony was certainly critical to the jury's deadlock.

*Id.* at 5.

Further, Appellant claimed, during the first trial, trial counsel "elicited [a] statement [from Officer Hill that] . . . there were two males involved in the shooting (not one)" and that, on the same night as Decedent's murder, there was a "retaliatory shooting" that occurred a few blocks away. *Id.*

Appellant claimed that his trial counsel was ineffective for failing to present the testimony of Ms. Haynes and the statement from Officer Hill during the second trial and for altering the strategy during the second trial, when the initial trial strategy resulted in a mistrial. *See id.* at 1-8.

On October 18, 2017, the PCRA court held a hearing on Appellant's petition. During the hearing, the PCRA court heard testimony from Appellant's trial counsel, Marit Michelle Anderson, Esquire (hereinafter "Attorney Anderson"). N.T. PCRA Hearing, 10/18/17, at 5. Attorney Anderson testified that she represented Appellant during both the first and second trials. *Id.* at 6. She testified that, during Appellant's initial trial:

> Our strategy was to say that it was not [Appellant] that shot the [Decedent], and the Commonwealth couldn't make their case out, basically. We attacked the identifications of the

[D]ecedent's brother, of Kyle Napper, the guy coming up the street, and we also presented Charletta Haynes as an alternative defense witness to say that it was, in fact, not somebody who was involved in the argument or in that area of the argument that had done the shooting but there were two gentlemen who had come from around the corner and shot the [D]ecedent.

*Id.* at 8-9 (some internal capitalization omitted).

Attorney Anderson testified that, after the first trial ended in a hung jury, she wrote a letter to some of the jurors and "inquired whether [any juror] would be willing to speak" about the jury deliberations. *Id.* at 18. Attorney Anderson testified that one juror agreed to speak with her; the juror informed Attorney Anderson "that it was 11 to 1 for guilty on first degree murder but there was one young woman who was a holdout because she identified with [Appellant] as being similar in age to her brother and so she held out and hung the jury." *Id.*

In preparation for the second trial, Attorney Anderson testified that she spoke with Appellant about the planned trial strategy "[m]any times." *Id.* at 19. She testified that she and Appellant:

decided that we were not going to go with the same theory as the first case, that, instead, we would, basically, admit that it was somebody that was related to the uncle or the uncle, himself, which was kind of the theory of the first case, that it was the uncle who did the shooting, but we were going to – because Kyle Napper had testified that the person had run into their mother's house and because [Appellant] had a brother, Antonio, who also lived at that location and also had been found hiding in a closet by the police when they were looking for [Appellant], . . . that we were going to, basically, say that Antonio was the one who did it but also try to bring into the trial aspects of maybe an imperfect self-defense to show that [Decedent] and/or [Decedent's] brother had

> instigated more violence into the situation than what they were saying.

*Id.* at 19-20.

As Attorney Anderson testified, they decided to change the trial strategy:

> Because in speaking with my partner, as well as with [Appellant], in consultation, we thought the strategy from the first trial didn't actually work very well, that it was 11 to 1 for guilty on first degree murder, which this case seemed to be since it was four shots to the body, and the identification by the brother was pretty hard to deal with, since they knew each other and lived across the street from each other and that we thought that if we had changed the strategy, there was a new [assistant district attorney] that was trying the case, that we could somewhat surprise him with our defense, as well as potentially get a third degree murder verdict if they felt, if the jury felt that [Decedent] and/or his brother may have instigated this violence in some way, even if they didn't believe our theory that Antonio Bishop[, Appellant's brother,] was the one who actually did the shooting.

*Id.* at 20-21.

As Attorney Anderson testified, she did not present testimony from Charletta Haynes during the second trial because Ms. Haynes' testimony did not fit the new trial strategy and because "[Ms. Haynes] was a horrible witness and was not very credible." *Id.* at 21. Specifically, Attorney Anderson testified, during the first trial: "the District Attorney cross-examined [Ms. Haynes] into looking, basically, like a fool, that she was really high and wasn't able to see much of anything because she was crouched down next to the car, things of that nature." *Id.*

Attorney Anderson also testified that she did not present the statement from Officer Hill during the second trial because Officer Hill's statement was "that the person arrested in the second shooting that night . . . met the description of the male running with [Appellant] in the first shooting." *Id.* at 31. Attorney Anderson testified that this statement was prejudicial to Appellant because it "indicated that [Appellant] was [] running from the first shooting." *Id.* at 32.

Appellant also testified during the PCRA hearing. Appellant testified that he agreed with the initial trial strategy. However, and in contrast to Attorney Anderson's testimony, Appellant testified that he "ma[d]e it clear to" Attorney Anderson and her partner that he wished "to stick with the first strategy at the second trial." *Id.* at 51.

At the conclusion of the hearing, the PCRA court held that Appellant was not entitled to post-conviction collateral relief, as Appellant failed to prove that Attorney Anderson lacked a reasonable basis for pursuing the particular trial strategy. *Id.* at 86-88. Appellant filed a timely notice of appeal. He raises one claim on appeal:

> Did the PCRA court err in holding [trial] counsel had a reasonable basis to switch trial strategy between [Appellant's] first and second trial?

Appellant's Brief at 2 (some internal capitalization omitted).

To be eligible for relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from "one or more" of the seven, specifically enumerated

circumstances listed in 42 Pa.C.S.A. § 9543(a)(2). One of these statutorily enumerated circumstances is the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii).

We note that counsel is presumed to be effective and "the burden of demonstrating ineffectiveness rests on [A]ppellant." ***Commonwealth v. Rivera***, 10 A.3d 1276, 1279 (Pa. Super. 2010). To satisfy this burden, Appellant must plead and prove by a preponderance of the evidence that:

> (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceedings would have been different.

***Commonwealth v. Fulton***, 830 A.2d 567, 572 (Pa. 2003). As this Court has explained:

> A claim has arguable merit where the factual averments, if accurate, could establish cause for relief. ***See Commonwealth v. Jones***, 876 A.2d 380, 385 (Pa. 2005) ("if a petitioner raises allegations, which, even if accepted as true, do not establish the underlying claim . . . , he or she will have failed to establish the arguable merit prong related to the claim"). Whether the facts rise to the level of arguable merit is a legal determination.
>
> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a

hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

***Commonwealth v. Stewart***, 84 A.3d 701, 707 (Pa. Super. 2013) (some internal quotations and citations omitted). "A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim." ***Id.***

Further,

Under the applicable standard of review, we must determine whether the ruling of the PCRA court is supported by the record and is free of legal error. The PCRA court's credibility determinations, when supported by the record, are binding on this Court. However, this Court applies a *de novo* standard of review to the PCRA court's legal conclusions.

***Commonwealth v. Spotz***, 18 A.3d 244, 259 (Pa. 2011) (internal citations omitted).

Appellant claims that the PCRA court erred in finding that Attorney Anderson had a reasonable basis for altering the trial strategy between the first and second trials. According to Appellant, "[t]he strategy employed at [Appellant's] first trial, which resulted in a mistrial, was supported by the evidence[; t]he strategy employed at [Appellant's] second trial was not supported by the evidence and implicated [Appellant]." Appellant's Brief at 11. This claim fails. As the PCRA court thoroughly explained at the hearing, Attorney Anderson's trial strategy during the second trial was indeed

"supported by the evidence" and was reasonable under the circumstances.

The PCRA court explained at length:

> So really what we are here to look at is did [Attorney Anderson] have any reasonable basis in choosing to proceed with a different defense the second time. . . .
>
> [Attorney Anderson] testified why the first strategy was utilized and in that testimony, she stated that it was the two-person -- we will call it the two-person defense. There were some bits and pieces from some of the statements to indicate that maybe more than one person was present. There was only one shooter, more than one person was present when the shooting occurred.
>
> There was more than one shooter, one, and, two, one of the descriptions matched [Appellant] but there was a suggestion, because of Miss Haynes' testimony, that the shooters came from around the corner, that [Appellant] was already present and it couldn't have been him.
>
> That defense was presented and along with that defense, it was necessary to then cross-examine Detective Spotwood as to descriptions of it being [] possibly two persons present, to cross-examine or try to get in any information from Police Officer Hill's statement, which was hearsay. I wouldn't have allowed it in anyway, but that there was a second incident related to the first where someone was shot and it was possibly the second person present with the shooter that was shot, so all of that came in and the jury could not reach a decision but the most telling, I guess, fact in this whole hearing is that [Attorney] Anderson reached out to the jury and juror number 9 responded and then juror number 9 gave her information. The reason she reached out to the jury is to get this information to decide how to proceed going forward.
>
> The information returned was that the jury was 11 to 1 for guilty of murder of the first degree and that there was only the one person, who would not reach a decision in the case, indicated that she identified with [Appellant] because he reminded her or he was very much like her brother.

Armed with that information, [Attorney] Anderson made the decision, along with her partner, that their defense was just not a good defense. It was not viable, but for happenstance, [Appellant] would have been found guilty of first degree murder.

Moving forward and looking into the evidence, the attorneys decided together that they needed to use a new strategy. Looking over all of the testimony and evidence, they decided that that strategy was that it was not [Appellant] but it was [Appellant's] brother who was the shooter.

They didn't come up with that out of thin air. [Attorney] Anderson testified what her reasons were and her partner's reasons were for choosing this alternative strategy.

She testified that since Mr. Napper testified that the shooter ran in [Appellant's] mother's house, which was a very salient fact in the case, one, that the defense had to deal with, and since the police found [Appellant's] brother, Antonio, hiding in the closet, . . . and since [Appellant] and his brother, Antonio, were close in age, and since their body build was similar, and since they could be mistaken if you were to view them from the back, which one witness did, the brother of the decedent, Reginald Coates, they made a decision that that would be a better strategy than the first strategy and [Attorney] Anderson acknowledged that [Appellant] did not wish to take an offer. There was an offer to third degree murder for 20 to 40 years. That clearly this case was a first degree murder case. The victim was shot two times close range in the front and then when the victim fell, was shot close range two more times in the back. So the stakes were high in this case for the defense.

[Attorney] Anderson also testified that there was a different assistant district attorney was going to try this case and that they believed there would be an element of surprise if they changed the strategy, as well, maybe throwing the ADA off because the ADA would have read through the notes from the first trial and would have been ready to use what they could from the first trial and, also, there was a decision made between [Attorney Anderson and her partner] that they would use certain evidence to show that it was the [D]ecedent and the [D]ecedent's brother – more so the

[D]ecedent's brother that were instigators in this matter, even though they could not ask for a self-defense charge or voluntary manslaughter based on the evidence as it would come out even under the best of circumstances, they could at least get to the jury the suggestion that it was the [D]ecedent and the [D]ecedent's brother who instigated this matter in the first place and would also give a reason for [Appellant's] brother, Antonio, to then retaliate, as well. He would have as much reason to do that, because it was his uncle too, as would [Appellant].

Base[d] on this new strategy, [Attorney] Anderson testified she would not call Miss Haynes. Miss Haynes, one, first of all, primarily was not needed for this defense and, two, she watched Miss Haynes during the first trial and, in her words, Miss Haynes was a . . . horrible witness. That on cross-examination Miss Haynes indicated that she was in a crouching position, couldn't see anything, that she was high on Xanax and on alcohol and that she was dismantled on cross-examination, basically. Furthermore, that Miss Haynes was not cooperative during the first trial. She was hard to find and she was hard to get to court.

[Attorney] Anderson testified that [she] and her partner discussed the new strategy with [Appellant], that, at first, [Appellant] was reluctant because he didn't want to say that his brother, Antonio, did it because he didn't want to get his brother in trouble but that both attorneys explained to [Appellant] that it would be highly unlikely that if the jury were to believe his version of events and he were to be found not guilty, that the Commonwealth would ever proceed against his brother because there was no evidence against his brother.

[Attorney] Anderson testified that eventually [Appellant] came around and agreed with the strategy and that had [Appellant] not agreed with the strategy, she would not have presented it because, logically speaking, had she gone forward, her and her partner, and presented a strategy that [Appellant] didn't agree with, [Appellant], who has the constitutional right to testify, could take the stand and testify completely adversely to the defense and her word, implode, the entire case.

[Attorney] Anderson testified she saw [Appellant] seven times, that she took notes each time. Her notes are admitted into evidence. Her notes show that there was a discussion regarding the alternative strategy or the new strategy which was going to be used in the second trial.

I am reading a quote here. This is from January 19, 2010. Put this on Antonio and mistaken I.D. as to [Appellant], same height, build, age. Napper sees shooter running toward house. Police search 5312 Reinhard and find Antonio hiding in the closet. Knew – this was the witness, Reginald Coates – knew [Appellant] had a gun from three weeks before. Saw person from behind, assumed it was [Appellant]. As far as Napper, too far away, drunk, rear view only, not described tattoos on arms because person not light skinned and it goes on and on.

That is an example how in-depth the conversation was between the attorneys and [Appellant] regarding this strategy. [Appellant] testified that he agreed with the strategy of the first trial. The second trial, he didn't think the strategy made sense. He didn't think there was enough evidence to support the theory, although the court just read all the evidence in that the attorneys went over with [Appellant] during the interview at the prison and that the lawyers told him either you take 20 to 40 or we are proceeding with the defense. He testified that they did tell him about juror number 9, that they never talked about Miss Haynes and that he told them he wanted to stick with the first defense.

[I]t is the petitioner's burden to show by a preponderance of the evidence that trial counsel lacked a reasonable basis for pursuing his trial strategy. . . . So the petitioner would have to prove by a preponderance of the evidence that an alternative not chosen offered a potential for success substantially greater than the course actually pursued and that just has not been shown in this particular case. The strategy chosen for the first trial almost landed [Appellant] in jail for the rest of his life and that is the alternative strategy that [Appellant] is talking about.

You can't just view this in hindsight based solely on the fact that [Appellant] was found guilty. You really need to look at

- 13 -

everything in this particular case, and when the court views everything that occurred when you talk about the first trial, the second trial and listened very carefully to the testimony, [the PCRA] court credits the testimony of the defense attorneys in this particular case and finds that the behavior of [Attorney Anderson], considering the totality of all the circumstances present here, was reasonable. . . .

N.T. PCRA Hearing, 10/18/17, at 77-88 (some internal capitalization omitted).

We agree with the PCRA court's cogent and thorough analysis and conclude that the court did not abuse its discretion when it determined that Appellant's ineffective assistance of counsel claim failed, as Appellant did not prove that "the particular course of conduct pursued by [Attorney Anderson] did not have some reasonable basis designed to effectuate [Appellant's] interests." **See Stewart**, 84 A.3d at 707. Appellant's claim on appeal, thus, fails.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/19